## CHRISTIAN v. VAN TASSEL.

*(District Court, S. D. New York. June 22, 1882.)*

1. WHARVES AND SLIPS—OBLIGATIONS OF OWNERS—WARNING OF OBSTRUCTIONS.
   The owner of a slip where canal-boats are in the habit of coming in to discharge their cargoes at the owner's elevator, is bound to keep it free from injurious obstructions at the head of the slip, or to warn vessels thereof.

2. SAME—EFFECT OF NOTICE.
   Where the libellant was notified that the water at the head of the slip was shoal, and in order to bring his after hatch beneath the elevator brought the bows of his boat up near to the bulk-head at about high tide, and when the tide fell, a few feet of her bow grounded upon some stones in the bank, of which stones the libellant was not notified, and the bows being high out of the water the boat was strained by the weight of cargo in the center, as the tide fell, causing leakage and damage to the cargo, and no diligence being proved in observing when she first grounded, or any attempt to haul her off immediately thereafter, and it not appearing that when efforts were made to haul her off they would have been successful but for the stones, *held*, that the sloping bank and the boat's grounding thereon at the libellant's risk, after notice, were the primary cause of the damage, aggravated by the stones, which increased the difficulty of removal, for which the defendant was responsible; and both causes concurring, and not being distinguishable, the libellant should recover but half his damages.

*Beebe, Wilcox & Hobbs,* for libellant.

*Butler, Stillman & Hubbard,* for respondent.

Brown, D. J. This is an action to recover damages sustained by the libellant's canal-boat B. F. Wade, and her cargo of grain, on October 29, 1879, through grounding in the slip near the bulk-head, while unloading at the respondent's elevator on pier 39, North river. The respondent owned in fee a strip 15 feet in width along the southerly side of the pier on which the elevator was situated, and 35 feet of the slip adjoining to the southward, up to and including so much of the bulk-head at the head of the slip. His business was to receive and transfer grain from boats coming into the slip for this purpose; and it is not disputed that he had control of at least 35 feet adjoining the pier, nor that he was legally bound to keep so much of it free from injurious obstructions.

On October 28th the libellant's boat came into the slip with some grain consigned to the respondent. That afternoon and the following morning a part was removed from the second and third hatches. It being desired to remove the grain from the fourth or aft hatch, known as the booby-hatch, it was found that there was not sufficient length up to the bulk-head to permit the boat to lie along-side the pier and admit the leg of the elevator into the booby-hatch, so that it was necessary either to wind the boat completely around stern foremost, or else to breast off the bows towards the middle of the slip. On account of the wind and obstructions from other boats, it was found impracticable to turn the boat about, and her bows were therefore shoved off until she could be brought up so as to admit the leg of the elevator.

After the grain was discharged her bows were found to be aground, and they were unable to haul her off until the flood tide, several hours afterwards. While aground by the bows the respondent's superintendent had pulled her stern off from the pier so as to admit another boat under the elevator. He had told the libellant that he would be obliged to interrupt the unloading of the latter's boat before commencing to unload her. The libellant's proofs show that the bows had grounded upon some stones which lay in the mud along the head of the slip. No holes, however, were made in the bottom by these stones, and their only effect would seem to have been to increase the difficulty of pulling her off when she was first noticed to be aground. The strain, however, caused her seams to open so as to make her leak badly, by which the rest of her cargo was damaged. The libellant claims that the respondent is liable for this damage— *First,* because his superintendent at the elevator assumed the direction and control of the boat, and ordered her to the position where

her bows grounded; *second,* for not keeping the slip clear of injurious stones; and, *third,* for moving her stern off where she lay aground at the bows, thereby twisting and injuring her. Notwithstanding the evidence on the libellant's part, I am satisfied that the respondent's superintendent did not assume the responsibility or control of the B. F. Wade in moving her bows round in the slip where she grounded. The libellant, her captain, was aboard, directing her movements, while it does not appear that the superintendent was either aboard or gave any orders on the subject. He testifies that he had previously told the libellant that he had better wind the ship around, because the water at the head of the slip was shoal. Two laborers employed by the respondent assisted in moving the boat. This, it seems, was a common practice, as the boats generally came too short-handed to be moved, as was necessary in the various changes in the slip, without help. This voluntary assistance from the respondent in no degree lessened the responsibility or control of the master of the boat, and the respondent cannot, therefore, be held liable on the first ground claimed.

In regard to the second ground, it is proved by several witnesses that the superintendent said that the ground at the head of the slip was a soft mud bottom. Nothing was said about stones, and the respondent denies that there were any along his 35 feet at the head of the slip. Without going into the details of the testimony, it is sufficient to say that I think the evidence conclusively shows that the bows of the boat did ground upon stones along the port side of the boat, which impeded her removal when she was found to have grounded.

On the part of the respondent, it was contended that the bows of the boat where she grounded were entirely beyond the line of 35 feet from the pier, which was the limit of the respondent's premises. The libel, sworn to less than two months after the injury, stated that the port bow of the boat was breasted off 30 feet from the pier; and it charged that the whole slip was under the respondent's control. The answer admitted that 30 feet were under his control. But upon the trial, the libellant and all of his witnesses who testified on the subject stated that the bows were shoved off only 17 or 18 feet.

There are other points in the proofs, however, which show that the statement of the libel as to the distance of the bows from the pier is very nearly correct. The libellant's son testifies that as she lay fastened to the post on the bulk-head he stepped from the bulk-head upon her bows, and that it was a fair, easy step,—"about two feet."

This must be considered as referring to the part of the bow nearest to the bulk-head, and not to the stem, which was somewhat further off. The carpenter, who was at work about the bows upon a staging made of two boards, each a foot wide, and fended off by cleats, testifies that she lay far enough from the bulk-head to allow the staging to be "admitted down nicely," and he says the stem was about four feet from the bulk-head. The bows of the boat being square, except the rounded corners, she would, at a distance of five feet from the stem toward the port side, be at least a foot and a half nearer the bulk-head than at the stem itself, which would make that part of the bows two and one-half feet from the bulk-head, and this accords very nearly with the evidence given by the libellant's son. The testimony of these two witnesses, substantially agreeing as to the distance from the bulk-head, enables the distance from the pier to be computed with approximate certainty. For the boat was 96 feet long; the forward line of the booby-hatch, which was 6 feet square, was 10 feet from her stern, leaving 86 feet to her stem; from the leg of the elevator to the bulk-head along the line of the pier was 83 feet 4 inches, and the leg had a lateral play of one foot and a little over each way. The distance between the booby-hatch and the bulk-head being, therefore, 2 feet 8 inches less than the distance to the stem, and the possible play of the elevator being, say 14 inches, the distance along the pier would be 1 foot 6 inches short, and $94\frac{1}{2}$ feet from the bulk-head would measure the point upon the wharf which the stern of the boat must reach, if lying along the pier, in order to admit the elevator leg into the booby-hatch. The boat was therefore swung out at the bows, while her port stern corner turned against the pier, until the elevator leg would go into the booby-hatch, and until her port bow, at its nearest point, came within $2\frac{1}{2}$ feet of the bulk-head, which would make $98\frac{1}{2}$ feet from the stern to the bulk-head along her port side. The effect of swinging her bows out to this distance would be to carry back the forward line of the booby-hatch about one foot further distant from the bulk-head, requiring the boat to be brought forward one foot more for that reason, so that $93\frac{1}{2}$ feet, instead of $94\frac{1}{2}$, must be taken as the base of the right angle along the side of the pier, whose hypothenuse, represented by the port side of the boat prolonged, is $98\frac{1}{2}$ feet; and this, by computation, would give 31 feet as the perpendicular along the bulk-head, and be the distance from the corner of the pier to the point on the bulk-head which the port side of the boat produced would strike. At a distance of 6 feet from the bulk-head, beyond which, on account of the rapid slope of the bottom, no

stones could have affected the boat, the distance of the boat from the pier would have been 2 feet less, or 29 feet, and at 3 feet from the bulk-head she would have been 30 feet distant. As the angle of divergence of the front of the boat from the line of the bulk-head is smae as the angle of the side from the line of the pier, it follows that the stem would be 1½ feet further-from the bulk-head than a point on her bows 5 feet to port, as above stated; while an equal distance on the starboard side of the stem would be 5½ feet distant from the bulk-head. By thus locating the bows of the boat with, I think, approximate certainty, it can be ascertained on whose premises the injury occurred.

By Mr. Richards, a disinterested witness called by the libellant, who carefully measured the head of the slip not long after the accident, it appears that, at a distance of three feet from the bulk-head, the water, at ordinary low tide, was one foot deep; and that at seven feet from the bulk-head it was three feet deep; and that from that distance the bottom descended very abruptly. It thus appears that even outside of three feet the bottom descended two feet in four. And as the starboard corner of the boat was from five to six feet from the bulk-head, it is clear that most of the impediment in hauling her off must have been upon the port side; and, locating the boat in the position I have assigned her, it will be found that the part of the boat within the limit of 7 feet from the bulk-head, and within the respondent's line of 35 feet from the pier, would be about 80 square feet, while the part to the south of the respondent's line would be about 15 square feet; and, as the latter portion was also in deeper water, there can be little doubt that the chief, if not the entire, part of the grounding was within the respondent's line. This situation is not at variance with the testimony of Capt. Christian, who saw the line from the post (which was 42 or 43 feet from the pier) passed over the port bow to the cleat on the deck upon the port side; and a line would fall on the port side of the stem. Two of the witnesses also testify that they saw her bows resting upon the stones along the port side. The testimony of the carpenter that, back of the stones upon which the bow rested, he could see daylight for four or five feet under the boat, seems to me incredible. The captain of the Botsford says that these stones are flat upon the top, and that for two or three feet back of them she did not touch bottom. Though they were not, therefore, such stones as would make holes in the bottom, they evidently were in the nature of obstructions, making a temporary grounding more likely to do injury, and the removal of the boat,

more difficult. For that reason, I think that the defendant was bound to remove them, or else give notice of them to persons about to move their boats up to the bulk-head.

The respondent's superintendent in this case did not warn the libellant of this danger, as it was his duty to do; and if it were proved clearly that the injury resulted from the stones alone, I think the respondent would be chargeable with the whole damage. But it seems to me impossible to say that the damage proceeded exclusively from the bows catching upon the stones. The stones made no holes, nor themselves caused any direct or immediate injury; their effect was simply to prevent the bows sinking a little deeper in the mud, and to make hauling her off more difficult. The explanation of the damage given at the trial was the straining of the boat from having the bows aground and high out of the water, while the stern was empty and the middle loaded with grain, so that she was bent and strained in the center at the fall of the tide; and this was principally due to the bank on which her bows were allowed to ground. But in addition to this cause, from the angling way in which the boat lay upon the bank and the rapid slope of the bottom under the starboard corner, it is evident that a further strain must have come from the starboard bows, which were heavily loaded, being in deeper water, which would tend to give the boat something of a twist; and this twist would exist whether her port bows were grounded upon rocks or mud; so, also, the weight of the cargo amidships would tend to strain the boat somewhat, though her bows were grounded upon mud only. More or less of this injury must therefore have occurred if no stones were present, unless she had been hauled off when discovered to be aground.

The evidence does not show any diligence on the part of the libellant either to prevent grounding or to keep watch when she would touch, so as to be able to haul her off in time, although he had been previously notified that the water there was shoal. It appears to have been high water at Governor's island on the day in question at 7:34 A. M., so that it must have been slack water, if not ebb tide, at the time the boat was hauled forward, which was after grain was removed that morning from the third hatch. There is no evidence that the captain took any soundings at any time, or any precautions against the falling tide. He does not seem to have noticed that she was aground until his attention was called to it by the captain of the Bottsford after the grain was unloaded from the booby-hatch.

There is nothing in the evidence to show, or to authorize me to assume, that if there had been no stones in the mud where she grounded, the efforts which were made to haul her off would have been effectual; and if she could not have been hauled off, more or less of the same damage must have arisen; nor is there anything in the evidence to show that the efforts to remove her were made as soon as she had got aground, or within such a period thereafter that it might be expected they would be able to remove her from the ordinary mud bottom with the means at their command. The libellant, in voluntarily moving the boat forward upon what was known to be shoal water, took the risk of whatever might result from grounding upon the usual mud bottom, and from the angling manner in which she lay upon it; but he did not take the additional risk resulting from the stones, of which he was not apprised and for which the respondent must be held responsible. But, nevertheless, the primary cause of the injury was the sloping bank, which kept the bows high out of water as the tide fell, causing the twist and strain in the center. The stones were not the primary cause of the injury; they merely aggravated the difficulty by making it less easy to haul the boat off when she was found to be aground. The stones, according to the proofs, did undoubtedly contribute substantially in holding her fast when she had grounded. Both causes must, therefore, be held to have concurred in producing the injury, in the absence of any proof that the stones alone prevented the removal of the boat when they first tried to haul her off. As both contributed to the injury, and as they cannot here be separated, I see no way but to divide the damage between the parties, as was done by Judge Sprague in the case of *Snow* v. *Carruth*, 1 Spr. 324, which will, I think, result in substantial justice to both. A similar rule was applied in this court by my predecessor, Judge Choate, in the case of *The William Murtaugh*, 3 FED. REP. 404, and *The William Cox*, Id. 645, where the loss occurred through the concurrent negligence of both parties, and this was affirmed by *Blatchford*, C. J., in the circuit court on appeal. 9 FED. REP. 672. See, also, *Connolly* v. *Ross*, 11 FED. REP. 342.

An order of reference may be taken to ascertain the damages.